NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 260418-U

NOS. 4-26-0418, 4-26-0419 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 4, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.D. and K.L., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
|     Petitioner-Appellee, | ) | Nos. 24JA134 |
|     v. | ) |     25JA108 |
| Ronald L., | ) | |
|     Respondent-Appellant). | ) | Honorable |
| | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Steigmann and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed the trial court's finding of unfitness and termination of respondent-father's parental rights to his children where he made no effort to have a relationship with them or complete any services.

¶ 2    Respondent, Ronald L., is the father of K.D. and K.L. The trial court terminated respondent's parental rights as to both children following unfitness and best-interests hearings held on the same day. Respondent appeals, arguing that the court erred in finding him unfit and terminating his parental rights. We affirm.

¶ 3    I. BACKGROUND

¶ 4    The State filed a petition on August 21, 2024, alleging that K.D. was neglected in that (1) he was not receiving proper care in that his mother, Rebecca D., failed to abide by the safety plan in place (705 ILCS 405/2-3(1)(a) (West 2024)) and (2) his environment was injurious

to his welfare (705 ILCS 405/2-3(1)(b) (West 2024)) because of (a) domestic violence between Rebecca and respondent, (b) Rebecca's drug use, (c) Rebecca's mental health issues, and (d) respondent's drug use. While the petition alleged neglect against both parents, this appeal involves only respondent. Rebecca has filed her own separate appeal.

¶ 5 A shelter care hearing was held the same day, with Rebecca stipulating that it was a matter of urgent necessity for K.D. to be removed from her home and be placed in shelter care. At the time, the Illinois Department of Children and Family Services (DCFS) was ordered to pay for DNA paternity testing to determine if respondent was the father of K.D. Respondent did not appear at the hearing.

¶ 6 The trial court entered an order of adjudication on January 22, 2025, finding K.D. neglected based on the allegations of the petition, including respondent's drug use and domestic violence with Rebecca. Respondent was not present at the hearing. Paternity test results filed with the court on January 28, 2025, revealed that respondent is the father of K.D.

¶ 7 On February 19, 2025, the trial court entered a dispositional order making K.D. a ward of the court. Respondent was not present. The order required both parents to complete recommended services, including substance abuse treatment, mental health services, parenting classes, and domestic violence treatment. Respondent never completed an integrated assessment.

¶ 8 Rebecca had another child, K.L., in July 2025. Rebecca indicated that respondent was the father. On July 16, 2025, the State filed a petition alleging that K.L. was a neglected minor because (1) as a newborn, his blood, urine, or meconium contained methamphetamine (705 ILCS 405/2-3(1)(c) (West 2024)) and (2) his environment was injurious to his welfare (705 ILCS 405/2-3(1)(b) (West 2024)) because of Rebecca's and respondent's drug use, domestic violence between respondent and Rebecca, and four of K.L.'s siblings had been adjudicated neglected and

taken from Rebecca's care.

¶ 9        A shelter care hearing for K.L. was held the same day, and Rebecca stipulated that K.L. should be removed from her care. K.L. was placed in shelter care, and the trial court ordered Rebecca and respondent to cooperate with DCFS and comply with the terms of the service plan. Respondent was present at the hearing.

¶ 10       On September 10, 2025, the trial court adjudicated K.L. neglected, alleging with respect to respondent that he was engaged in drug use and domestic violence with Rebecca. Respondent was not present at the hearing.

¶ 11       On October 28, 2025, the State filed a motion for termination of respondent's parental rights to K.D., alleging that respondent (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to K.D.'s welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) abandoned K.D. (750 ILCS 50/1(D)(a) (West 2024)); (3) deserted K.D. for more than three months preceding the commencement of this action (750 ILCS 50/1(D)(c) (West 2024)); (4) failed to make reasonable efforts to correct the conditions which were the basis for the removal of the minor within nine months following an adjudication of neglect, specifically, January 22, 2025, through October 22, 2025 (750 ILCS 50/1(D)(m)(i) (West 2024)); and (5) failed to make reasonable progress toward the return of K.D. to him within nine months of the adjudication of neglect, specifically, January 22, 2025 through October 22, 2025 (750 ILCS 50/1(D)(m)(ii) (West 2024)).

¶ 12       On October 29, 2025, the State filed a motion for termination of respondent's parental rights to K.L. The motion alleged, in part, that respondent, the putative father, was unfit in that he (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to K.L.'s welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) abandoned K.L. (750 ILCS 50/1(D)(a)

(West 2024)); (3) deserted K.L. for more than three months preceding the commencement of this action (750 ILCS 50/1(D)(c) (West 2024)); and (4) failed to demonstrate a reasonable degree of interest, concern, or responsibility as to the welfare of the newborn child during the first 30 days after his birth (750 ILCS 50/1(D)(l) (West 2024)).

¶ 13       The trial court entered a dispositional order on October 29, 2025, making K.L. a ward of the court. The court admonished the parents to cooperate with DCFS, comply with the service plan, and correct the conditions that required K.L. to be in care. Respondent was not present for the hearing.

¶ 14       At the first appearance on October 29, 2025, respondent did not appear. The matter was set for a hearing on January 21, 2026. On January 21, 2026, respondent was again not present, and the case was set for a hearing on the motions for termination of parental rights on April 2, 2026.

¶ 15                                    A. Unfitness Hearing

¶ 16       On April 2, 2026, respondent appeared for the hearing on the motions to terminate his parental rights, and his counsel asked for a continuance, as it was the first time they had met. The State objected, noting that respondent had several months to prepare for the trial. The trial court denied the motion. The State asked the court to take judicial notice of the adjudicatory orders, dispositional orders, and DNA results showing that respondent was K.D.'s and K.L.'s father. Respondent's counsel did not object and stated, "I believe the Court can take judicial notice of the pleadings in the file and orders."

¶ 17       At the unfitness hearing, Cassandra Winters testified that she was a child welfare specialist with DCFS and was assigned as K.D.'s caseworker in March 2025. Winters testified that she has been K.L.'s only caseworker since his birth in July 2025. According to Winters,

- 4 -

respondent was found, through DNA tests, to be the father of both K.D. and K.L. Winters stated that K.D. came into care because K.D. had methamphetamine in his bottle and Rebecca told police that respondent put the methamphetamine there.

¶ 18       When Winters took over the case, respondent was required to complete a list of services, including obtaining housing, having legal income, participating in domestic violence classes, participating in parent education/coaching classes, undergoing a mental health evaluation, cooperating with DCFS, and undergoing substance abuse services, including drug screens. Winters reported that, during her time as the caseworker, respondent had not completed any services and made no progress on any of the services.

¶ 19       Winters testified that she sent respondent multiple letters, which he signed for, so she knew he received them. However, he never contacted her. Those letters included her contact information, as well as contact information for her supervisor. At one point, Winters had a phone number for respondent, but he never responded when Winters called him.

¶ 20       When K.L. was born, he came into care immediately because he tested positive for methamphetamine and amphetamine. Respondent appeared at the shelter care hearing for K.L. and requested an attorney. Respondent never came to court again until the termination hearing. He also never signed consents so that referrals for services could be made for him. Since K.L. was born, respondent has not had a single visit with him through DCFS. Respondent also never called Winters to ask how K.L. was doing. As far as Winters knew, respondent never visited K.D., but she knew he was present at Rebecca's home during an unannounced visit by Winters when K.D. was also present.

¶ 21       Winters learned on March 16, 2026, through DNA testing she initiated, that K.L.'s father is respondent. No other person came forward to assert paternity of K.L. Once respondent

was established to be K.L.'s father, he was ordered to obtain adequate housing, be drug-free, obtain income so he can meet K.L.'s needs, complete drug tests, and engage in domestic violence services.

¶ 22    According to Winters, the prior caseworker determined that respondent did not meet the requirements for domestic violence services. However, Winters recommended domestic violence services for respondent because "there has been multiple admits of fighting between the two parents." Winters obtained respondent's address through a "diligent search" and sent certified mail there, for which respondent signed. She admitted she never went to respondent's home.

¶ 23    Winters had a phone number for respondent and she tried to contact him. She said she only received one text in response "in the entirety of the case." Winters denied that respondent had "engaged in anything at all." She said, "No services have been completed." She also testified that respondent had not cooperated with DCFS. Winters further testified that DCFS was never close to giving custody of K.D. or K.L. to respondent.

¶ 24    Winters testified that respondent was at the birth of K.L. While respondent could have signed a voluntary acknowledgement of paternity to be considered K.L.'s father immediately, he refused to do so. He also never initiated a paternity action to determine if he was K.L.'s father. Rather, Winters initiated DNA testing using respondent's DNA from his prior paternity test for K.D.

¶ 25    No other witnesses testified. The State argued that respondent had not been engaged at all and had not "even bothered to visit." He had not seen K.L. since his birth. The State argued that it had met its burden and that this was a very clear case of unfitness. Respondent argued that the testimony showed that DCFS had several opportunities to engage with him but failed to do so. He further argued that the services for K.L. would not have been put into place

until it was established by DNA that he was K.L.'s father, "which happened just a couple weeks ago." He asked that both petitions be denied but contended that K.L.'s was separate and distinct because he was just recently determined to be his father. The guardian *ad litem* (GAL) contended that the State had met its burden of proof because Winters's testimony was unrebutted.

¶ 26 The trial court ruled that with respect to K.D., respondent had an opportunity to complete services, stay in touch with the caseworker, visit, and show that he wanted to be a part of his life, but he "chose not to." The court explained that it was respondent's responsibility "if he wants to be a father to actually make the effort to just what—nine, 10 numbers, punch 10 numbers into a phone and say, [']['][Winters], what do I need to do?['] He never even bothered to punch in 10 numbers on a phone."

¶ 27 The trial court found that the State had shown by "very clear and convincing evidence" that respondent (1) failed to demonstrate a reasonable degree of interest, concern, or responsibility as to K.D.'s welfare, (2) abandoned and deserted K.D. due to his lack of involvement, and (3) failed to make reasonable efforts or progress from January 2025 to October 2025. Thus, the court found respondent unfit as to K.D.

¶ 28 With respect to K.L., the trial court found that respondent was the only named putative father for K.L. and made no effort to determine if he was K.L.'s father. He was at K.L.'s birth but never saw K.L. after that and never did anything to step up and be "a dad to this kid." According to the court, the DNA test did not matter because respondent never did anything to show he was interested in K.L., finding out if he was K.L.'s father, or visiting K.L. The court found that the State had shown "by clear and convincing evidence that he likewise has failed to demonstrate any degree of interest, concern, or responsibility during the first 30 days or the entire life of this child." The court further found that respondent "clearly abandoned and deserted the

child."

¶ 29 The trial court asked the parties if they were ready to proceed to the best-interests hearing. Respondent again asked for a continuance. The court denied the request, stating:

"All right. These proceedings do have to be held in a bifurcated manner, but there's nothing that says they have to be held on different days. The evidence just has to be presented at different stages.

We were set today for a hearing on the State's motion, which includes best[-]interest issues."

¶ 30 B. Best-Interests Hearing

¶ 31 At the beginning of the hearing, the State asked the trial court to take judicial notice of "prior testimony and evidence presented." The court stated, "I will take judicial notice of that."

¶ 32 Winters testified that K.D. was currently placed with his maternal grandmother and her husband and has been with them since the case opened in August 2024. Winters reported that K.D. is "doing great in his placement." She said, "He loves his grandparents very much." Winters testified that the placement meets all K.D.'s needs and K.D.'s grandparents are willing to adopt him. K.D. is attached to both his grandparents and calls them "grandma" and "grandpa." At the time of the hearing, K.D. was 22 months old.

¶ 33 K.L. was placed in a traditional foster placement and not with his grandparents because they felt they could not properly care for both him and K.D. K.L. was eight months old at the time of the hearing and had been in the same placement since he came into care. Winters reported that K.L. is "doing great" in his placement. All his needs are being met. The foster parents have expressed a willingness to adopt K.L.

¶ 34 K.L. is one of six children in the foster home and loves it. He is happy and enjoys

when the other children are around. K.L. and K.D. see each other at least twice a month, and the foster parents plan to continue those visits. Winters testified that it was in K.D.'s and K.L.'s best interests for respondent's parental rights to be terminated because the children deserved "stability."

¶ 35 Winters testified that respondent would have had an opportunity to visit K.L. prior to establishment of his paternity because K.L.'s mother listed him as K.L.'s putative father. Respondent had no authorized visits with either K.D. or K.L. since they had been in care.

¶ 36 The State argued that it had met its burden of proving that it was in the best interests of K.D. and K.L. to remain in their current placements because both children were in loving homes and doing well, and their caregivers were willing and able to adopt them. Respondent argued for additional time to develop a bond with both K.D. and K.L. and indicated that he was willing to engage in services and visits with the children. The GAL agreed with the State that it was in the best interests of the children to remain in their current placements.

¶ 37 The trial court listed the factors to be considered in making a best-interests determination. The court acknowledged that K.L. had spent his entire life in the care of his foster parents and K.D. had spent most of his life with his grandparents. The court found that both children appeared to be "very secure," to "feel very loved," and to be "happy" in their arrangements. The court found that the children seemed to have an attachment to their foster families, "who are providing their care every single day of their lives." The court noted that both families were willing to adopt the children and provide the permanence that the children needed and deserved.

¶ 38 The trial court found that the State had shown "by more than a preponderance of the evidence" that it was in the best interests of the minors that the parental rights of respondent

be terminated. The court explained:

> "These children need permanence. They deserve that. I do not believe that giving parents more time will make any difference in this case. They have had plenty of time to show that they are even going to show an interest in their children, let alone engage in services, but just to show that they were going to show an interest. They have not done that, and I do not find that giving them any additional time would be of any benefit to anyone."

Thus, the court terminated respondent's parental rights and awarded guardianship and custody to DCFS, with the power to consent to adoption.

¶ 39　　　This appeal followed.

¶ 40　　　　　　　　　　　　II. ANALYSIS

¶ 41　　　Respondent argues that the trial court improperly found him unfit and terminated his parental rights to K.D. and K.L.

¶ 42　　　"Under the Juvenile Court Act of 1987 [(Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2024))], the involuntary termination of parental rights involves a two-step process." *In re C.W.*, 199 Ill. 2d 198, 210 (2002). First, there must be a showing, by clear and convincing evidence, that a parent is "unfit" as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *C.W.*, 199 Ill. 2d at 210. If the trial court makes a finding of unfitness, the court then considers whether it is in the best interests of the child that parental rights be terminated. *C.W.*, 199 Ill. 2d at 210. "[T]he trial court's unfitness finding serves as the basis for any subsequent best-interests ruling." *In re J.W.*, 2024 IL App (1st) 231918, ¶ 18.

¶ 43　　　"Since the juvenile court was in the best position to view and evaluate the parties, its decision is entitled to great deference, and a finding of unfitness will not be reversed unless it

is against the manifest weight of the evidence." *In re M.W.*, 2019 IL App (1st) 191002, ¶ 50. "A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." *M.W.*, 2019 IL App (1st) 191002, ¶ 50.

¶ 44                                        A. Unfitness

¶ 45          "Although section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed 'unfit,' any *one* ground, properly proven, is sufficient to enter a finding of unfitness." (Emphasis in original.) *C.W.*, 199 Ill. 2d at 210 (citing 750 ILCS 50/1(D) (West 1998)). Here, respondent was alleged to be unfit under five grounds with respect to K.D. and four grounds with respect to K.L.

¶ 46          One of the grounds under which respondent was found to be unfit for both K.D. and K.L. was his "[f]ailure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2024). "The language of this subsection is disjunctive." *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 91. "A court may properly base a finding of unfitness on a parent's failure to maintain a reasonable degree of interest *or* concern *or* responsibility for the child's welfare." (Emphasis in original.) *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 91. All three must be present to avoid a finding of unfitness. *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 92.

¶ 47          A parent's interest, concern, and responsibility "must be objectively reasonable." *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 50.

> "In deciding whether a parent's interest in, concern for, and responsibility toward the child's welfare have been reasonable in degree, the circuit court should consider the parent's efforts to visit the child and to otherwise maintain contact with the child, as well as the parent's inquiries into the child's welfare." *In re J.H.*,

2020 IL App (4th) 200150, ¶ 72.

"Infrequent visits are an indication a parent is not showing reasonable interest, concern, or responsibility in a child." *In re Y.F.*, 2023 IL App (1st) 221216, ¶ 43. Additionally, the failure of a parent to comply with the directives of a service plan is evidence that a parent has not shown reasonable interest, concern, or responsibility as to the child's welfare. *Tr. A.*, 2020 IL App (2d) 200225, ¶ 50.

¶ 48 Here, the evidence showed that respondent did not show any interest, concern, or responsibility as to K.D.'s or K.L.'s welfare. Respondent made no effort to keep in touch with Winters or DCFS, as he was directed to do. He did not complete any services required by the service plan. He also made no effort to visit either K.D. or K.L. the entire time they were in care or even inquire into their well-being. Thus, the trial court's finding that respondent failed to show interest, concern, or responsibility as to K.D. and K.L. was not against the manifest weight of the evidence.

¶ 49 Respondent argues that because services would not likely begin with respect to K.L. until his paternity was established, he should not be found unfit as to K.L. We disagree.

¶ 50 As the trial court and Winters noted, respondent was present at the birth of K.L., and Rebecca named him as the father of K.L. No other putative fathers came forward. As Winters explained, respondent would have been allowed to visit K.L. before the paternity results came back because Rebecca said he was the father. However, respondent made no effort to visit K.L. or ask Winters how he was doing. Additionally, respondent made no effort to ascertain his paternity of K.L. A putative father's failure to expeditiously institute a paternity action will support a finding that he failed to demonstrate a reasonable degree of interest, concern, or responsibility as to the welfare of a child. See *In re Adoption of J.R.G.*, 247 Ill. App. 3d 104, 109-

- 12 -

111 (1993).

¶ 51    Here, respondent never initiated a paternity action. Rather, Winters used respondent's DNA from the paternity test for K.D. to establish that respondent was K.L.'s father. Even though the paternity test did not reveal that respondent was the father of K.L. until two weeks before the termination hearing, there was plenty of time for respondent to show interest, concern, and responsibility before that since K.L. was eight months old at the time of the hearing. Respondent could have visited K.L. and begun to establish a bond with him, but he failed to do so. Thus, there was clear and convincing evidence that respondent failed to maintain "a reasonable degree of interest, concern, or responsibility as to his child's welfare" with respect to both K.D. and K.L.

¶ 52    Respondent contends that Winters and DCFS had a duty to seek him out to engage in services, but that is not the law. It was respondent's responsibility to take the initiative to provide his current address and phone number to Winters and DCFS and notify them of any changes. It was also his duty to contact Winters and DCFS so that he could complete the services required of him. Respondent never did that. In fact, although Winters reached out to respondent at the address and phone numbers she had for him, she received only one text message in response and never met respondent until the termination hearing. Respondent never even completed an integrated assessment or signed consents to receive services. Respondent's inaction supports the finding that he failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of K.D. and K.L. It was his responsibility to do so, not Winters's or DCFS's.

¶ 53    Respondent also seems to call into question the propriety of the trial court's adjudicatory and dispositional orders entered in this case. However, he has no right to challenge those orders in this appeal from the order terminating his parental rights. "An adjudicatory order

is not a final and appealable order." *In re Ay. D.*, 2020 IL App (3d) 200056, ¶ 37. "Instead, the dispositional order is the final order from which an appeal properly lies." *Ay. D.*, 2020 IL App (3d) 200056, ¶ 37. To perfect an appeal from a dispositional order, a party must file a notice of appeal within 30 days after entry of the order. *Ay. D.*, 2020 IL App (3d) 200056, ¶ 37 (citing Ill. S. Ct. R. 303(a) (eff. July 1, 2017)).

¶ 54 Here, the dispositional order for K.D. was entered on February 19, 2025, and the dispositional order for K.L. was entered on October 29, 2025. Thus, respondent had 30 days after those dates to appeal those orders. See Ill. S. Ct. R. 303(a) (eff. July 1, 2017). However, he failed to do so. Respondent filed his notice of appeal in this case on April 3, 2026, indicating that he was appealing only the judgment entered on April 2, 2026. Thus, we have no jurisdiction to address the validity of the adjudicatory or dispositional orders. See *Ay. D.*, 2020 IL App (3d) 200056, ¶ 38; see also *In re Z.M.*, 2019 IL App (3d) 180424, ¶ 50 (finding that court lacked jurisdiction to review the propriety of the adjudicatory and dispositional orders following an appeal from the termination of parental rights because a timely appeal was not filed from those orders).

¶ 55 B. Best Interests

¶ 56 Respondent states in a heading in his appellate brief that "the trial court's order finding [him] unfit and that termination of his parental rights was in the minors' best interest[s] was against the manifest weight of the evidence." However, in the body of his brief, he does not address the best interests hearing, except to discuss two procedural issues relevant to that hearing.

¶ 57 First, respondent contends that it was error for the trial court to take judicial notice of "prior testimony and evidence presented at the unfitness portion" at the best-interests hearing. This argument lacks merit for several reasons. First, respondent did not object to this process, so

he has forfeited this argument on appeal. See *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1132 (2000) (holding that failure to object at trial forfeits the issue on appeal). Forfeiture notwithstanding, there is no prohibition against a court taking judicial notice of such testimony. In fact, in any hearing under the Juvenile Court Act, a court may take judicial notice of

> "prior sworn testimony or evidence admitted in prior proceedings involving the same minor if (a) the parties were either represented by counsel at such prior proceedings or the right to counsel was knowingly waived and (b) the taking of judicial notice would not result in admitting hearsay evidence at a hearing where it would otherwise be prohibited." 705 ILCS 405/2-18(6) (West 2024).

Here, respondent was represented by counsel at the unfitness hearing and does not contend that taking judicial notice of the prior sworn testimony would result in admitting hearsay. Thus, there was nothing improper about the court taking judicial notice of the testimony from the unfitness hearing at the best-interests hearing.

¶ 58    Second, respondent argues that the trial court erred in holding the unfitness hearing and best-interests hearing on the same day. Again, we disagree. First, respondent has forfeited this argument on appeal by failing to raise it below. See *Jones*, 316 Ill. App. 3d at 1132. Therefore, we need not address this issue on the merits. Nevertheless, even if we were to do so, we would find no error because, although a court is required to hold a bifurcated proceeding with the unfitness hearing first followed by the best-interests hearing, there is no prohibition against a best-interests hearing being held on the same day as an unfitness hearing, as the court in this case noted. In fact, the practice of holding an unfitness hearing and a best-interests hearing on the same day is quite common. See, *e.g.*, *M.W.*, 2019 IL App (1st) 191002, ¶ 45; *In re T.A.*, 359 Ill. App.

3d 953, 955 (2005); *In re Robert S.*, 357 Ill. App. 3d 214, 215 (2005); *In re J.R.*, 342 Ill. App. 3d 310, 312 (2003). Thus, there was no error in the court holding the hearings on the same day.

¶ 59      As explained above, although respondent contended in a heading of his brief that the trial court's order finding that "termination of his parental rights was in the minors' best interest was against the manifest weight of the evidence," nowhere in his brief does he present any argument, let alone a cogent legal argument, that the court's best-interests finding was against the manifest weight of the evidence. Thus, he has forfeited any such claim. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (stating points not argued in an opening brief are forfeited).

¶ 60      Forfeiture notwithstanding, the trial court's finding that it was in K.D.'s and K.L.'s best interests to terminate respondent's parental rights was not against the manifest weight of the evidence. Following a finding of unfitness, the focus shifts from the parents to the child. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. In making a "best interests" determination, the court shall consider the following factors "in the context of the child's age and developmental needs:"

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such

- 16 -

love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals, including the child's wishes regarding available permanency options and the child's wishes regarding maintaining connections with parents, siblings, and other relatives;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child, including willingness to provide permanency to the child, either through subsidized guardianship or through adoption." 705 ILCS 405/1-3(4.05) (West 2024).

¶ 61 Here, the manifest weight of the evidence supported the trial court's conclusion that it was in the best interests of K.D. and K.L. for respondent's parental rights to be terminated. Almost every factor supported terminating respondent's parental rights because he had no interaction or relationship with his children. Moreover, the children were in adoptive placements where they were happy, loved, and cared for. K.D. had been with his grandparents for 18 of the 22 months of his life at the time of the termination hearing, and K.L. had been in his foster

placement for 8 months, which was his entire life. The children had developed a sense of security and attachment in their foster placements, while they had not developed bonds or attachments to respondent, who they had not seen for most of their lives. Under these circumstances, there is no question that it was in K.D.'s and K.L.'s best interests for respondent's rights to be terminated so that they could have the permanence and stability they deserved.

¶ 62                          III. CONCLUSION

¶ 63         For the reasons stated, we affirm the trial court's judgment.

¶ 64         Affirmed.